50.  By October of 1994, Interneuron and Wyeth Defendants learned that there were many problems concerning the FDA's approval of Redux including that: (a) that secondary pulmonary hypertension was an adverse effect in patients treated with Redux; and (b) that the risk/benefit ratio of Redux was "unsatisfactory". Further, the FDA had indicated it had found Redux "unapprovable." However, at the request of Interneuron, the FDA agreed to withhold sending an unapprovable letter until April of 1995.

51.  On or about January 5, 1995, Wyeth Defendants received further information on VHD among Pondimin users in the form of follow-up reports to those originally reported in 1994 as well as 6 new reports of VHD among Pondimin users. In the months of January, February, July and August of 1995 and thereafter, Wyeth Defendants received additional new reports of Diet Drug induced VHD, however, Wyeth Defendants failed to obtain any more information about these reports from any source; made no attempt to have the reports evaluated by any cardiologists; failed to undertake further testing or analysis of any sort; and made no attempt to look back through its computer database to look for other reports of VHD. Furthermore, Wyeth Defendants mislabeled VHD adverse events as "non-serious" and did not report many of these VHD adverse events to the FDA and refused to undertake any measures to ensure its Pondimin label included VHD as a possible adverse event.

52.  On or about February 17, 1995, the FDA's Dr. Bilstad advised Interneuron's Dr. Sandage that the Redux NDA was nonapprovable and that the principal reason was because "the application did not contain adequate safety data to define the risk of developing pulmonary hypertension."

53.  On June 15, 1995, the Wyeth Defendants' James Ottinger reported to Joseph Bathish the status of the European Committee on Proprietary Medicinal Product's ("CPMP")

22

pharmacovigilance discussion wherein the CPMP working party concluded that a causal relationship between anorectic agents, like fenfluramine and dexfenfluramine, and the occurrence of pulmonary hypertension had been established.

54.    On or about July 19, 1995, Interneuron, in its bid to have Redux approved, concluded that significant public relations and lobbying were needed as stated by Interneuron's Dr. Sandage: "[w]e agree that a significant PR/lobbying is needed. We will be getting numerous parties involved immediately. This includes the Washington, D.C. PR firm of Hill and Knowlton, possibly former US Surgeon General C. Everett Kroop, M.D., Nancy Taylor, and Yur Strobos, M.D., Ph.D. (for high level contacts at the FDA and Congress) Judy Stern, Ph.D. and Dick Atkinson (for working through American Obesity Association). We intend to add additional groups as necessary."

55.    By 1995, additional medical reports and studies had been published further elevating the pre-existing scientific knowledge within the medical community that increases in serotonin caused VHD.  These reports and studies, including Robolio PA, Rigolin VH, Wilson JS, et al. *Carcinoid heart disease: correlation of high serotonin levels with valvular abnormalities detected by cardiac catheterization and echocardiography.* Circ 1995;92:790-5, published on or about August 15, 1995 set forth a clear warning to all within the medical community including Defendants that serotonin releasing agents such as fenfluramine and dexfenfluramine cause VHD.

56.    In September of 1995, JoAnn Manson, along with several of her colleagues at the Harvard Medical School, issued a press release regarding the results of a "study" of the health risks associated with obesity claiming that the data the authors had collected from the Nurses Health Study provided compelling evidence for the proposition that "even mild to moderate

23

overweight is associated with a substantial increase of premature death." In October of 1995, Dr. Manson testified before the FDA that this study supported the conclusion that the FDA should approve dexfenfluramine, though it later became evident that this fatally flawed and erroneous "study" found no statistically significant increased risk of mortality associated with mild to moderate obesity. Dr. Manson later revealed that she in fact was a paid consultant to Interneuron.

57.    On or about September 15, 1995, Interneuron decided that it would secure the services of General Alexander M. Haig, Jr. to attend upcoming FDA meetings on Redux in an effort to exert pressure and influence aimed at the approval of Redux. Alexander Haig was hired by Interneuron and became Interneuron's Director.

58.    In or about October, 1995, during the time Interneuron was continuing discussions with the FDA, Interneuron also attempted to secure the services of Newt Gingrich to exert influence upon the FDA.

59.    On or about October 2, 1995, Dr. Rich advised Interneuron it was clear that evidence of safety for long-term use was lacking with respect to pulmonary hypertension. Dr. Rich advised Interneuron regarding the IPPHS data which showed the risk of significant injury being at least one in 10,000 users or 100 cases per million per year and questioned Interneuron as to the clinical safety of Redux based on Interneuron's own claims that Redux would cause weight reductions between 5% and 15%, which would translate into 248 lives saved per million per year. Further, Dr. Rich questioned the efficacy of Redux assuming Redux produced a consistent average 5% reduction in body weight stating, "[a]s I compute the 5% weight loss in a 300lb individual to a new weight of 285lbs, I question as to whether that will truly translate in substantial improvement in health to the patient." Dr. Rich further advised that the Redux label needed to

24

clearly indicate to the prescribing physician that there is a causal relationship between Redux and the development of PH. However, the Integrated Summary of Safety for Redux as set forth in it label, without a Black Box Warning, ultimately stated that:

> Anecdotal cases of PH have been associated with other weight loss agents such as phentermine and the racemic d,l-fenfluramine. In Europe, in post-marketing surveillance between 8/84 and 7/93 there were reports of PH in 51 patients being treated with dexfenfluramine

60.    On or about October 12, 1995, Interneuron had further discussions with the FDA's Dr. Lutwak who confirmed the FDA's continued concerns about the safety of Redux which had proven to have resulted already in too many adverse event reports.

61.    In or about November of 1995, Interneuron again attempted to push its lobbying efforts and caused to be issued a letter to Speaker Newt Gingrich stating: "This letter voices my deep concern about certain actions of the FDA. Our friends at the FDA are doing it again - I have used Pondimin for 22 years as a safe alternative to more stimulating drugs for obesity. I have never had any problems with it. An improved form, dexfen, has the same effect but without the drowsiness of the parent compound. It has been in general use since 1985 in Europe. The FDA has again denied our citizens an effective treatment of a potentially fatal disease (obesity)."

62.    At a meeting of an FDA advisory committee on Redux, Interneuron solicited the services of Director Alexander Haig, who on behalf of Interneuron provided incorrect and unsubstantiated information to the FDA including representations that Redux helps twice as many people lose 10 percent of their weight as a placebo in preliminary tests and that ten million people have used the drug internationally without side effects.

63.    On or about November 21, 1995, Defendant, Interneuron, entered into an exclusive "Contract Manufacturing Agreement" with Defendant, Boehringer, by which Boehringer agreed

to manufacture, develop, test, assemble, package, label, prepare and/or supply Redux exclusively for and/or to Defendant, Interneuron, including supplying Defendant, Interneuron, with all of its requirements of Redux for ultimate sale in the United States including the State of Massachusetts, and the states where Plaintiffs ingested the Diet Drugs.

64.    On or about January 18, 1996, the FDA advised Interneuron's Dr. Sandage that further changes to the labeling for Redux were recommended pursuant to the review of Dr. Lutwak despite the fact that the FDA Advisory Committee had voted at a second meeting to approve Redux, albeit without the benefit of the safety information which Interneuron and the Wyeth Defendants had in their possession.

65.    On or about April 29, 1996, the FDA approved Redux for sale in the United States and the first sales of Redux on the market in the United States began in June of 1996.

66.    On or about July 17, 1996, after approval of Redux by the FDA, the FDA's Randy Hedin contacted Interneuron's Sonja Loar and reiterated again the FDA's ongoing concerns regarding pulmonary hypertension and the FDA's consideration of a Black Box Warning to which Interneuron voiced opposition in favor of continuing with the proposed bold-face, all CAPS warning.

67.    On or about August 19, 1996 the FDA met with Interneuron and stated that it still felt a Black Box Warning may be appropriate for Redux, a fact that Interneuron later acknowledged given the serious and high risk of pulmonary hypertension associated with Redux.

68.    On or about, August 26, 1996, the New England Journal of Medicine reported the final results of IPPH Study which had been preliminarily released in February 1994. The IPPH Study concluded that fenfluramine-based anorexigens, such as fenfluramine and dexfenfluramine, increased the risk of PH .

26

69.    On or about August 29, 1996, an article was published in the New England Journal of Medicine authored by Dr. Stuart Rich and other preeminent doctors entitled *Appetite-suppressant Drug and the Risk of Primary Pulmonary Hypertension*" which addressed the results of the IPPH study and concluded that that the use of fenfluramine/dexfenfluramine substantially increased the risk of pulmonary hypertension in that the risk associated with dexfenfluramine use was equal to 14 deaths caused by per million patients treated thereby yielding a very "problematic" benefit:risk ratio of 20:1 or 280 lives saved for 14 deaths caused.

70.    Defendants were aware of the result of the IPPH study by at least November 1995, well in advance of its official publication in the New England Journal of Medicine, nevertheless, Defendants failed to apprise the public or physicians that the risk of contracting PH was many multiples of that previously reported by the Wyeth Defendants in their label and other literature. Even after the Brenot article and the preliminary release of the IPPH Study, Interneuron and the Wyeth Defendants failed to withdraw the New Drug Application ("NDA") for Redux and the Wyeth Defendants failed to remove Pondimin from the market when Interneuron and Wyeth Defendants knew of the extreme danger, causal relationship and substantial risk of harm associated with the use the Diet Drugs.

71.    Even prior to their knowledge of the IPPH Study, the manufacturers and distributors of the Diet Drugs knew about the risks of PH associated with using the subject drugs from experience with and subsequent banning of such drugs in various countries in Europe as described herein above. Defendants did not apprise Plaintiffs, the public at large, or Plaintiffs' physicians of these material facts and risks.

72.    Between 1994 and 1996, while fenfluramine was on the United States market and while dexfenfluramine was under FDA consideration, at least 30 cases of heart valve problems

27

were identified among users of the Diet Drugs examined by physicians in Belgium. This information was reported to Belgian drug regulators and Servier. Servier's partners and or licensees, including Interneuron and the Wyeth Defendants, knew or should have known of the numerous reports of VHD among Diet Drug users.

73.     Interneuron and Wyeth Defendants failed to properly investigate the reports and failed to warn doctors and consumers, including Plaintiffs, regarding the known risks of VHD associated with use of the Diet Drugs. Interneuron and Wyeth Defendants also did not adequately inform the FDA regarding the Belgian studies by suggesting that the reports were irrelevant because some of the studied individuals had also ingested herbs which Interneuron and Wyeth Defendants allegedly assumed caused VHD. In fact, Wyeth Defendants and Interneuron only reported one Belgian case to the FDA involving Redux's ingredient dexfenfluramine in an amendment to its Redux NDA.

74.     During the time fenfluramine was sold on the United States market and at the time Interneuron filed its New Drug Application with the FDA for dexfenfluramine, Defendants had available to it the information that its European counterpart sub-licensee Servier had accumulated during its marketing of dexfenfluramine in Europe for over a decade concerning the safety and efficacy of the dexfenfluramine, including medical literature, adverse event reports relating to the use of the dexfenfluramine in Europe, clinical and other medical studies, and communications from medical providers. This information which was known or should have been known by Interneuron and Wyeth Defendants established inter alia, that:

   a.     by 1977, Defendants knew or should have known that the mechanism of action of the Diet Drugs and their affects on serotonin were responsible for causing pulmonary hypertension in exposed patients, and knew or should have known that the same mechanism of action also was likely the same mechanism which caused heart valve disease in carcinoid patients;

b.    by 1992, Defendants knew or should have known that the Diet Drugs had been associated with fibrotic changes in the heart tissues of animals exposed to the drug;

c.    by February of 1994, Belgian physician Mariane Ewalenko, MD advised Servier of seven patients who had been taking the Diet Drugs and who were found suffering from valvulopathy;

d.    between 1994 and 1996, other Belgian physicians, including Jean Malak, MD and Jean-Francois Adam, MD, discussed and corresponded extensively with Servier officials regarding numerous cases involving valvular regurgitation suffered by patients who had ingested the Diet Drugs;

e.    between 1994 and 1996, various Belgian doctors reported at least 30 cases of VHD associated with the use of the Diet Drugs;

f.    between 1994 and 1996, numerous adverse event reports were received by Interneuron and Wyeth Defendants which provided or should have provided notice of the association between ingestion of the Diet Drugs and VHD; and

g.    by 1995, available and reliable medical literature was available to Defendants from which Defendants' either knew or should have known that Diet Drugs caused an increase in circulating serotonin and that this very serotonin-related mechanism, also found in ergotamine toxicity and carcinoid syndrome, created a high risk for VHD.

75.    On April 2, 1996, just three weeks before Redux was approved for marketing in the United States, Dr. B. Taylor Thompson, of Massachusetts General Hospital and Harvard Medical School provided an analysis of 32 pulmonary hypertension cases, which were part of the November 1995 Safety Update, to the FDA and to Interneuron and Wyeth Defendants. The Thompson analysis concluded that of the 32 cases, sixteen (16) cases involved secondary pulmonary hypertension. Dr. Thompson specifically placed Interneuron and Wyeth Defendants on notice that VHD was one of the primary causes for the secondary hypertension. Interneuron and Wyeth Defendants did not update the November 1995 Safety Update, which would have put the public, the FDA, and plaintiffs' physicians on notice of the relationship between Diet Drugs and VHD.

76.    On April 29, 1996, the Defendants introduced the defective product Redux into the United States without informing the public, or Plaintiffs' physicians of the dangers and risks of VHD and secondary pulmonary hypertension associated with the Diet Drugs.

77.    On or about June 1, 1996, Interneuron entered into a "Co-promotion Agreement" with the Wyeth Defendants which both reaffirmed the joint venture or partnership between Interneuron and the Wyeth Defendants and provided for Interneuron to market, promote, advertise, distribute, label, detail, supply, package and/or sell Redux in consideration for the payments from Interneuron's co-promoter, Wyeth Defendants, for percentages of profit derived from sales generated by Interneuron's sales representative sales force.

78.    On or about August 28, 1996, only four months after approval of Redux, Interneuron and Wyeth Defendants were provided and reviewed a study entitled "Cardiac Adverse Effects of Fenfluramine Isomers" prepared by Dr. Francis Wagniart of Servier revealing a higher incidence among Redux users of PH than was previously known. The findings further established Interneuron and Wyeth Defendants' knowledge of serious adverse side effects caused by the ingestion of the Diet Drugs. However, Interneuron and Wyeth Defendants failed to act responsibly in taking necessary action to protect the public, including Plaintiffs, from Diet Drug related injuries.

79.    In March 1997, the Defendants were informed by doctors of heart valve problems among users of the Diet Drugs when they received a detailed report from physicians in meetings at the Mayo Clinic in Rochester, Minnesota. However, Defendants failed to undertake any action to warn or otherwise prevent further injury to the consuming public including Plaintiffs.

80.    In July of 1997, the Mayo Clinic discovered additional cases of damage to heart valves caused by the Diet Drugs and made this additional information known to Defendants.

81.     On or about July 8, 1997, the Mayo Clinic in Rochester, Minnesota released an emergency report linking the use of the Diet Drugs to unusual, potentially life-threatening disease related to heart valves.

82.     Independent medical center data from the Mayo Clinic and elsewhere indicated that the Diet Drugs were associated with heart valve defects in as many as one-third of the patients who used the drug. The Mayo Clinic study concluded that dexfenfluramine users needed to be informed about the risk of PH and VHD.

83.     Notwithstanding the fact that Interneuron and the Wyeth Defendants received detailed reports during separate meetings with investigators from the Mayo Clinic and the MeritCare Medical Center in Fargo, North Dakota regarding these findings as early as March of 1997, four months before the *New England Journal of Medicine* article reporting these findings was published, Interneuron and the Wyeth Defendants did not halt the wide spread use of the Diet Drugs until September of 1997.

84.     On July 8, 1997, the FDA issued a public health advisory regarding the use of the Diet Drugs which stopped the implementation of the DEA's administrative action relating to de-scheduling.

85.     On or about September 15, 1997, the FDA forced Defendants to withdraw the Diet Drugs from the United States market because the independent medical center data from the Mayo Clinic in Rochester, Minnesota, and elsewhere indicated that the Diet Drugs were associated with heart valve defects in as many as one-third of the patients who took the Diet Drugs alone or in combination with phentermine ("the initial Mayo study"). In fact, of 291 patients tested, one-third of them had damaged aortic or mitral heart valves; less than 1 percent of the general population has such damage.

31

86.    On November 11, 1997, results of a study funded by the National Institute of Health ("NIH"), of the association between heart valve abnormalities and the use of the Diet Drugs, individually or in combination with phentermine, were reported at the annual conference of the North America Association for the Study of Obesity in Cancun, Mexico.  The study, conducted by investigators at the Hennepin County Medical Center in Minneapolis, Minnesota ("the Hennepin study"), found significant heart valve leaks in 24% of 226 individuals taking one or more of these drugs.

87.    Notably, the Hennepin study included a control or comparison group of 81 people matched by age, sex, height, and weight to the 226 cases.  The 226 cases took fenfluramine and/or dexfenfluramine, while the 81 controls did not.  Only 1% of the controls had significant heart valve leaks.  All 307 individuals in the Hennepin study (cases and controls) had echocardiograms, which were read by physicians who were "blind" as to the status of each individual, i.e., the reading physicians had no knowledge as to whether the person had taken the diet drugs or not.  The Hennepin study investigators found that dexfenfluramine ("Redux") is as likely to lead to heart valve defects as fenfluramine.  Of the 226 patients observed in the Hennepin study, 145 had taken the combination of fenfluramine and phentermine, 40 had taken dexfenfluramine, 27 had taken dexfenfluramine in combination with phentermine, and 14 had taken all three drugs.

88.    On November 13, 1997, officials from the FDA, NIH and the Centers for Disease Control issued a joint recommendation for medical monitoring of users of the Diet Drugs.

**General Allegations**

32

89.    At all times material hereto, Defendants researched, created, formulated, tested, developed, designed, licensed, assembled, compounded, manufactured, marketed, promoted, advertised, distributed, labeled, detailed, supplied, packaged and/or sold pharmaceutical Diet Drugs which were defective and unreasonably dangerous to consumers, including Plaintiffs.

90.    Defendants knew or should have known that the Diet Drugs, when used alone or in combination with phentermine, created significant risks of serious injuries or disorders, including VHD, secondary pulmonary hypertension, related cardiopulmonary dysfunction, cardiomyopathy, congestive heart failure, and/or death, as to which Defendants failed to make proper, reasonable or adequate warning to the public about the risks associated with the use of their products.

91.    At all times material hereto, though Defendants knew or should have known that dangerous risks were associated with the use of the Diet Drugs, Defendants proceeded to or permitted the Diet Drugs to be assembled, compounded, manufactured, marketed, promoted, advertised, distributed, labeled, detailed, supplied, packaged and/or sold without adequate warnings of the serious side effects and dangerous risks.

92.    Both during the initial submission of the Redux NDA and thereafter, Interneuron and the Wyeth Defendants did not adequately report to the FDA, the public, and Plaintiffs' physicians information in its possession which related directly the risk of developing valvular heart valve disease and pulmonary hypertension.  The public, the FDA, the medical community and Plaintiffs, were misled by these actions and omissions, resulting in Plaintiffs having received no or inadequate warnings regarding the true risks associated with ingesting Redux.

93.    Interneuron and Wyeth Defendants failed to conduct sufficient and adequate pre-marketing research and testing to properly determine the risks and severity of serious side effects

33

including VHD and/or pulmonary hypertension caused by the ingestion of Diet Drugs which Interneuron and Wyeth Defendants knew or should have known about.

94.    Interneuron and Wyeth Defendants failed to conduct sufficient and adequate post-marketing surveillance as to the ingestion of Diet Drugs and resultant adverse events and side effects to both properly determine and quantify the risks and severity of serious side effects and take reasonable and necessary remedial action to protect the public, including Plaintiffs, from injuries being suffered by Diet Drug users which Interneuron and Wyeth Defendants knew or should have known about.

95.    Defendants failed to properly and adequately warn Plaintiffs, both directly and by and through Plaintiffs' prescribing physicians, of the dangers associated with Redux such that Plaintiffs' prescribing physicians did not have available to them the body of knowledge that an adequate warning from Interneuron would have communicated to Plaintiffs' prescribing physicians.

96.    As a result of Defendants' acts and omissions and other tortious conduct more fully detailed and alleged herein, Plaintiffs have sustained significant heart valve regurgitation and resultant injuries.

97.    Interneuron and Wyeth Defendants undertook a course of action and marketing strategy which included advertising and promotional campaigns to aggressively promote and sell the subject drugs.

98.    The product warnings in effect during the time the Diet Drugs were prescribed were non-existent or inadequate as to the need to alert prescribing physicians and consumer patients of the actual adverse health risks associated with these drugs, which risks were then known (or should have been known) to the Interneuron and Wyeth Defendants.  Potential users were not

34

informed about the products and the serious health effects which Interneuron and Wyeth Defendants knew or should have known could result from the use of the subject drugs.

99.    Wyeth Defendants and Interneuron, through their misrepresentations and omissions, created the impression and conveyed to Plaintiffs and others on whom Plaintiffs would rely, that the use of the Diet Drugs alone or in combination with phentermine was safe and had fewer adverse health and side effects than were actually associated with the Diet Drugs.

100.    Interneuron and Wyeth Defendants undertook a promotional campaign that included the funding of and/or placement of numerous articles in scientific, medical and general interest magazines extolling the virtues of the Diet Drugs in order to induce widespread use of the products.

101.    Interneuron and Wyeth Defendants actively encouraged, or failed to effectively discourage, the widespread prescribing of the Diet Drugs to patients that were not clinically obese.

102.    Interneuron and Wyeth Defendants downplayed and understated the health hazards and risks associated with the Diet Drugs.

103.    Interneuron and Wyeth Defendants failed to reveal relevant information to doctors and potential Diet Drug users including Plaintiffs and their physicians regarding the safety of the Diet Drugs.

104.    Interneuron and Wyeth Defendants' through their product inserts and other documents, misrepresented a number of facts regarding the Diet Drugs, including the following:

  a)  The presence of adequate testing of the Diet Drugs;
  b)  Diet Drugs' efficacy including but not limited to the severity, frequency and discomfort of side effects and adverse health effects caused by the drugs;
  c)  The relative risks associated with the Diet Drugs including the prevalence of pulmonary hypertension; and

d)  The relative risks associated with the Diet Drugs including the prevalence of VHD.

105.  After learning of the extreme dangers associated with the Diet Drugs, Defendants did not adequately or appropriately provide information about the Diet Drugs or other relevant information to physicians in the United States, including Plaintiffs' physicians.

106.  At all times relevant hereto, the Defendants' labeling on the Diet Drugs were totally inadequate to alert Plaintiffs, prescribing physicians and others of PH, VHD and/or secondary pulmonary hypertension and other dangers and risks associated with Diet Drug usage. As a result, physicians have over-prescribed the Diet Drugs to patients who were under-informed regarding the risk of secondary pulmonary hypertension or VHD associated with the drugs.

107.  At all times relevant to this cause, Interneuron and Wyeth Defendants also knew or should have known of many other studies, regulatory actions and concerns, incidences of injury and/or death, concerns about the subject drugs, safety among scientists, researchers, regulators and other knowledgeable professionals, the dangers of drug combinations, meetings among pharmaceutical industry officers, executives or employees (including Defendants), internal memos and reports of health concerns regarding the subject drugs, the lack of sufficient safety studies before and during marketing of the subject drugs, the contents of Defendants' own files, plans and reports, the danger of the off-label use of medications, safety concerns about the drugs which could block or change FDA approval, regulatory actions, reports of injury and concerns about the subject drugs in Europe, case reports of pulmonary hypertension, regulatory efforts to make changes in the warning and labels required on these products and the plans and actions of Defendants to fight such changes, statements by medical professionals regarding safety concerns for the subject drugs, and adverse effects reported therefrom, the failure of Defendants to report

36

incidences of PH resulting from the use of the subject drugs to regulators and health care professionals, the identification of groups most at risk of injury, and many other material facts regarding the Diet Drugs which would have shown the danger and adverse health effect of using the subject drugs, but did not inform Plaintiffs, the public at large, or Plaintiffs' physicians of these material facts and risks.

108. Defendants, having undertaken the manufacture, sale, marketing, distribution and promotion of the diet drugs described herein owed a duty to provide Plaintiffs, physicians, state regulators and others upon whom it was known, or should have known, by Defendants that Plaintiffs would rely, accurate and complete information regarding the subject drug products.

109. Interneuron and Wyeth Defendants indicated to Plaintiffs, Plaintiffs' physicians, regulators and others upon whom it was known, or should have been known that each Plaintiff would rely, that the Diet Drugs were safe and effective, that the benefits of taking the subject drugs outweighed any risks and provided inaccurate safety and effectiveness information regarding its products including but not limited to the propensity to cause serious physical harm. The continuous and ongoing course of action started as early as 1993, if not earlier, and continued through repeated acts and non-disclosure every year since then, in the State of Massachusetts and in those States in which the Plaintiffs resided, were prescribed and ingested the Diet Drugs, throughout the United States, and elsewhere.

110. Interneuron's and Wyeth Defendants' fraudulent misrepresentations took the form of, among other forms, express and implied statements, publicly disseminated misinformation, misinformation provided to regulatory agencies, inadequate, incomplete and misleading warnings about the subject products, failure to disclose important safety and injury information

37

regarding the products while having a duty to disclose to Plaintiffs and others such information, and elaborate marketing, promotional, and advertising activities.

111.  The Diet Drugs were in fact unsafe, and the use of the Diet Drugs posed an unreasonable risk of injury and death that outweighed the purported benefits of their use, such that injury was in fact caused to Plaintiffs and others.

112.  Defendants, individually and jointly, failed to adequately warn Plaintiffs and those whom they knew Plaintiffs would rely of the hazards associated with the use of the Diet Drugs and failed to provide this knowledge from Plaintiffs and others. As a result of this failure to warn, Plaintiffs were caused to suffer injuries and damages.

113.  The Diet Drugs were defective and unreasonably dangerous when they left the possession of Defendants in that, among other ways:

> a.  the Diet Drugs caused injury to the user far beyond any warned, noticed, expected or reasonable side effect or adverse reaction and when placed in the stream of commerce they contained unreasonably dangerous defects subjecting Plaintiffs to risks from expected or known usage, including bodily injury and death, which exceeded the benefits of the subject drugs;
>
> b.  when placed in the stream of commerce the Diet Drugs were defective in design and formulation, making use of the drugs more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with obesity and weight loss;
>
> c.  the Diet Drugs contained insufficient and/or ineffective warnings to alert consumers and users to the risks of injury and death by VHD and PH;
>
> d.  the Diet Drugs were insufficiently tested;
>
> e.  there were insufficient instructions on the proper use of the Diet Drugs;
>
> f.  there were inadequate post-marketing warnings or instructions because, after Defendants knew or should have known of the significant risks previously described, Defendants failed to provide adequate warnings to users and consumers, and/or their physicians, and continued to promote the sale and use of the subject drugs;
>
> g.  the Diet Drugs had not been materially altered or modified prior to the use of said drugs by Plaintiff; and
>
> h.  Defendants were in the business of distributing and selling the Diet Drugs which make the basis of this lawsuit.

114.  Defendants assembled, compounded, manufactured, marketed, promoted, advertised, distributed, labeled, detailed, supplied, packaged and/or sold these products in a defective condition that was unreasonably dangerous to the user or ultimate consumer of this product. Each product was expected to and did reach the user and consumer Plaintiffs without substantial change in the condition at which it was sold.

115.  As a direct and legal result of the defective condition of the Diet Drugs, Plaintiffs sustained and will continue to sustain serious and permanent injuries, physical pain and suffering, impairment, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life past and future; undergoing medical monitoring; loss of earnings and loss of the ability to earn money in the past and the future; expense of hospitalization, medical and nursing care and treatment and medical monitoring in the past and in the future; and fear and mental anguish concerning future medical problems associated with their injuries.

116.  Defendants, Interneruon and Wyeth Defendants, employed, contracted, associated or otherwise engaged pharmaceutical sales persons, area account mangers, district managers, area development managers, area business directors and other representatives ("sales representatives") in furtherance of marketing, promoting, selling and/or distributing the Diet Drugs through the United States.  Interneuron and Wyeth Defendants, by and through these sales representatives, provided inaccurate information or failed to provide information relating to the dangers associated with the Diet Drugs, to the consuming public, including Plaintiffs and Plaintiffs' prescribing physicians.  During the course of their employment or other engagement with Interneuron and Wyeth Defendants, the sales representatives undertook the following both within the scope of their employment and at the instruction and/or direction of Interneuron and Wyeth Defendants: failed to convey adequate warnings to Plaintiffs through their prescribing

physicians; negligently distributed, marketed, advertised and/or promoted the Diet Drugs; made negligent misrepresentations regarding the safety and efficacy of the Diet Drugs; negligently failed to provide sufficient instructions to Plaintiffs and/or their prescribing physicians regarding the use of said drugs; made misrepresentations to physicians and staff, with the intent that these statements be relied upon to the detriment of patients, including Plaintiffs, including but not limited to: that the Diet Drugs were safe and effective when used as directed, and that the Diet Drugs were effective for long term weight loss. Moreover, Interneuron and Wyeth Defendants, by and through their sales representatives did not relay the true risk of serious cardiovascular and life threatening diseases such as VHD and PH.. Upon information and belief, these sales representative, armed with Plaintiffs' doctors' profile consisting of personal biographical information and periodic reports on prescribing habits, specifically discussed the importance of co-promotion of the Diet Drugs within the Interneuron and Wyeth Defendant network and with other companies and, in a coordinated fashion, implemented those discussions and agreements by bombarding prescribing physicians, including Plaintiffs' physicians, with misleading information about the Diet Drugs. As a result of the tortious actions described herein by Defendants, Interneruon's and Wyeth Defendants' sales representative agents, Interneuron and Wyeth Defendants are liable to Plaintiffs in strict products liability, negligence, fraudulent misrepresentation, fraudulent concealment, and unfair and deceptive trade practices, as well as those other actions pled in this complaint.

117. Plaintiffs were prescribed the Diet Drugs for weight loss. Plaintiffs received no warnings or statements regarding adverse effects of Diet Drug use which would warn Plaintiffs against the use of such Diet Drugs or that such Diet Drugs could cause VHD and associated injuries suffered by Plaintiffs.

## COUNT I
## STRICT PRODUCT LIABILITY
## DEFECTIVE DESIGN

118. Plaintiffs adopt by reference all of the allegations above, each inclusive, as though fully set forth herein.

119. At all times material hereto, Defendants engaged in the business of researching, formulating, testing, developing, designing, licensing, assembling, compounding, marketing, promoting, distributing, detailing, and/or selling the Diet Drugs that were defective and unreasonably dangerous to consumers, including Plaintiffs.

120. At all times material hereto, the Diet Drugs which were researched, formulated, tested, developed, designed, licensed, assembled, compounded, marketed, promoted, distributed, detailed, and/or sold by Defendants were expected to reach, and did reach, prescribing physicians and consumers including Plaintiffs, without substantial change in the condition in which they were sold.

121. At all times material hereto, the Diet Drugs were in a defective and unreasonably dangerous condition at the time it was placed in the stream of commerce in ways which include, but are not limited to, one or more of the following particulars:

    a.    When placed in the stream of commerce, the Diet Drugs contained unreasonably dangerous design defects and was not reasonably safe as intended to be used, subjecting Plaintiffs to risks which exceeded the benefits of the drug;

    b.    When placed in the stream of commerce, Diet Drugs were defective in design and formulation, making use of the drug more dangerous than an ordinary consumer would expect and more dangerous than other risks associated with obesity and/or weight loss;

    c.    Diet Drugs were insufficiently tested;

    d.    The intended use of the drugs caused harmful side effects which outweighed any potential utility; and

    e.    Diet Drugs were not safe for its intended use as a weight loss drug.

122.  But for the aforementioned defective and unreasonably dangerous conditions, the Diet Drugs would not have been prescribed to Plaintiffs, Plaintiffs would not have ingested the drugs, and Plaintiffs would not have sustained the injuries alleged herein.

123.  As a direct and legal result of the defective condition of the Diet Drugs, Plaintiffs have sustained serious and permanent injuries including, but not limited to, injuries to the heart, pulmonary system and/or other related injuries, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and/or nursing care and treatment, loss of earnings and loss of the ability to earn money in the future.  Plaintiffs' injuries and losses are continuing in nature.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, as well as all costs of this action.

### COUNT II
### STRICT PRODUCT LIABILITY
### FAILURE TO WARN

124.  Plaintiffs adopt by reference all of the allegations above, each inclusive, as though fully set forth herein.

125.  Diet Drugs were defective and unreasonably dangerous when it left the possession of Defendants in that Diet Drugs contained warnings which were misleading regarding the purported benefits associated with the drug and were inadequate and insufficient to alert physicians and consumers, such as Plaintiffs, to the dangerous risks and reactions associated with the drugs, including, but not limited to, pulmonary hypertension, heart valve disorders, and other serious and life threatening side affects, especially since any weight loss experienced was transitory.  Plaintiffs' injuries and losses are continuing in nature.

126.  The physicians prescribed the Diet Drugs to Plaintiffs for the intended purpose.

127.  Neither the prescribing physicians nor Plaintiffs could have discovered any defect in the drug through the exercise of reasonable care.

128.  Defendants are held to the level of knowledge of an expert in the field.

129.  The prescribing physicians did not have substantially the same knowledge as an adequate warning from the manufacturer or distributor should have communicated to the prescribing physicians.

130.  The warnings that were given by Defendants to the prescribing physicians were not adequate, accurate, or clear, and were ambiguous.

131.  The limited warnings which were provided to the doctors were inappropriately placed in the fine print of the materials provided to the prescribing physicians, and Defendants failed to display those warnings prominently enough such that prescribing physicians and the consuming public would appreciate the true risks of severe and life threatening complications which had been reported in association with Diet Drugs, including, but not limited to, the pulmonary hypertension and VHD.

132.  Defendants had a continuing duty to warn the prescribing physicians and Plaintiffs of the dangers associated with the Diet Drugs.

133.  As a direct and legal result of Defendants' failure to warn, Plaintiffs have sustained serious and permanent injuries including, but not limited to, injuries to the heart, pulmonary system and/or other physical injuries, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings and loss of the ability to earn money in the future.  Plaintiffs' injuries and losses are continuing in nature. WHEREFORE, Plaintiffs demand judgment against Defendants for damages, as well as all costs of this action.

## **COUNT III**

43

## NEGLIGENCE

134.  Plaintiffs adopt by reference all of the allegations above, each inclusive, as though fully set forth herein.

135.  Defendants directly or indirectly, negligently and/or defectively made, created, formulated, tested, developed, designed, licensed, assembled, compounded, manufactured, marketed, promoted, advertised, distributed, labeled, detailed, supplied, packaged and/or sold the Diet Drugs throughout the United States.

136.  At all times material hereto, Defendants had a duty to Plaintiffs to exercise reasonable care in the researching, formulating, testing, developing, designing, licensing, assembling, compounding, marketing, promoting, distributing, detailing, and/or selling of Diet Drugs.

137.  Defendants breached that duty and was negligent in its actions and omissions toward Plaintiffs and their prescribing physicians in ways which include, but are not limited to, the following:

a.  Failure to include adequate warnings with the drugs that would alert physicians to the potential risks and serious side affects of the drug;

b.  Failure to adequately and properly test the drug before placing the drugs on the market;

c.  Failure to conduct sufficient testing of the drugs which, if properly performed, would have shown that the drug had serious side effects, including, but not limited to, pulmonary hypertension and heart valve disorders;

d.  Failure to adequately warn Plaintiffs' prescribing physicians that use of the drugs should be accompanied by a professional examination and regularly scheduled follow-up examinations so that pulmonary hypertension, heart valve disorders and other serious side effects could be avoided or detected early;

e.  Failure to adequately warn Plaintiffs' prescribing physicians that use of the drugs carried a risk of pulmonary hypertension, VHD, and other serious side effects;

f.  Failure to adequately warn Plaintiffs' prescribing physicians that use of the drugs carried a risk of temporary or permanent disability due to pulmonary hypertension, VHD, and other serious side effects

44

g.  Failure to warn Plaintiffs' prescribing physicians that use of the drug carried a risk that heart surgery might become necessary to repair or replace heart valves damaged by the drug;

h.  Failure to provide adequate post-marketing warnings or instructions after Defendants knew or should have known of the significant risks of pulmonary and/or VHD and/or cardiovascular injury from the use of the drug;

i.  Failure to adequately warn Plaintiffs' prescribing physicians that the drug should not be prescribed for a long period of time or for use in conjunction with other weight loss drugs;

j.  Failure to warn the prescribing doctors that the use of the drug should be limited to those who specialized in the treatment of obesity;

k.  Failure to warn Plaintiffs' prescribing doctors that use of the drug should be limited to the morbidly obese and not used for cosmetic loss of weight;

l.  Failure to warn Plaintiffs' prescribing doctors that the drug would not substantially reduce weight or reduce weight for a long period of time;

m.  Failure to warn Plaintiffs' prescribing doctors that the use of the drug had not been properly studied as to safety in animals or humans; and

n.  Failure to display the warnings that were provided in a manner which would properly alert the prescribing doctors as to the seriousness of the adverse events which had been reported in association with the drug.

138.  Defendants knew or should have known that Diet Drugs caused unreasonably dangerous risks and serious side effects of which Plaintiffs and the prescribing physicians would not be aware.

139.  But for Defendants' negligent conduct as described herein, Plaintiffs' prescribing physicians would have never prescribed Diet Drugs to Plaintiffs, Plaintiffs would not have ingested Diet Drugs and Plaintiffs would not have suffered harm from ingesting Diet Drugs.

140.  As a direct and legal result of the negligence of Defendants, Plaintiffs have sustained serious and permanent injuries including, but not limited to, injuries to the heart, pulmonary system and/or other physical injuries; disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings and loss of the ability to earn money in the future. Plaintiffs' injuries and losses are continuing in nature.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, as well as all costs of this action.

## COUNT IV
## FRAUDULENT/NEGLIGENT MISREPRESENTATION

141.  Plaintiffs adopt by reference all of the allegations above, each inclusive, as though fully set forth herein.

142.  Defendants, having undertaken the manufacturing, marketing, prescription dispensing, distributing and promotion of Diet Drugs owed a duty to provide complete and accurate information regarding the drug to Plaintiffs, their physicians, and anyone else Defendants knew or should have known would ingest or prescribe the drug.

143.  Defendants misrepresented material facts regarding the safety and efficacy of the Diet Drugs, and failed to inform Plaintiffs, the public and Plaintiffs' prescribing physicians these material facts.

144.  Defendants fraudulently and/or negligently misrepresented to Plaintiffs, Plaintiffs' physicians, the FDA, and the general public that Diet Drugs were safe and effective, that the benefits of taking the drug outweighed any risks, and/or fraudulently and/or negligently misrepresented and concealed safety and effectiveness information regarding the product, including but not limited to the drug's propensity to cause serious physical harm. The continuous and ongoing course of action constituting fraudulent and/or negligent misrepresentation on Plaintiffs started as early as 1992, if not earlier, and continued through repeated acts and non-disclosure every year since then throughout the United States and elsewhere.

46

145.  Diet Drugs were in fact unsafe and the use of Diet Drugs posed a risk of injury and death which outweighed the purported benefits of its use, such that injury was in fact caused to Plaintiffs and others.

146.  Defendants made fraudulent and/or negligent misrepresentations regarding adverse information at a time when it knew, or should have known, that Diet Drugs had defects, dangers, and characteristics that were other than what Defendants had represented to the prescribing doctors or other dispensing entities, the FDA, and the consuming public, including Plaintiffs.  Specifically, Defendants misrepresented the following:

a.   It was dangerous to prescribe the Diet Drugs;

b.   Diet Drugs were not intended for cosmetic weight-loss;

c.   The Diet Drugs carried risks of serious adverse effects;

d.   After discontinuing use, most users of the Diet Drugs would regain any weight lost as a result of its use;

e.   There had been insufficient studies regarding the safety and efficacy of the Diet Drugs for use in treating weight loss;

f.   That prior studies, research, reports and/or testing had been conducted linking the use of the drug or similar drugs, to serious adverse reactions, including, but not limited to,  pulmonary hypertension, and VHD;

g.   The fact Defendants knew, or should have known of twenty-five (25) cases of heart-valve damage reported in Belgium and/or elsewhere in Europe related to the drug or similar drugs;

h.   The fact that Defendants knew or should have known of the greatly increased risk of developing  pulmonary hypertension, as well as a great number of reports of the disorder related to the drugs' use;

i.   the known number of cases reported to Defendants of persons who had contracted pulmonary hypertension after ingesting Diet Drugs;

j.   The results of studies on animals, which revealed marked abnormalities in the cardiac and/or pulmonary tissues of these animals following diet drug ingestion;

k.   The safety and efficacy of Diet Drugs in labeling, advertising, product inserts, and other materials;

l.   The number of deaths that had been associated with Diet Drugs, the number of cases of heart valve damage associated with the drug, the number of cases of  pulmonary hypertension associated with the drug, and the fact that the drug had been associated with pulmonary hypertension and VHD;

m.   That the Diet Drugs were less effective than a placebo in achieving their intended purpose; and

47

n.    The nature and extent of any beneficial health effect the Diet Drugs would provide the user.

147.   The misrepresentations alleged above were perpetuated directly and indirectly by the Defendants.

148.   The fraudulent and/or negligent misrepresentations of Defendants took the form of, among other things, express and implied statements, publicly disseminated misinformation, misinformation provided to regulatory agencies, inadequate, incomplete and misleading warnings about the subject products, failure to disclose important safety and injury information regarding the products while having a duty to disclose to Plaintiffs and others such information.

149.   Defendants knew or should have known that these representations were misleading at the time they were made or omitted, and made the representations with the intent or purpose that Plaintiffs and Plaintiffs' physicians would rely on them, leading to the use of the Diet Drugs by Plaintiffs.

150.   At the time of Defendants' fraudulent and/or negligent misrepresentations, Plaintiffs and Plaintiffs' physicians were unaware of the inaccuracy of the statements being made and believed them to be true.

151.   Plaintiffs' physicians and Plaintiffs justifiably relied on and were induced by the misrepresentations and relied on the absence of adverse safety information in the prescription and ingestion of the Diet Drugs.

152.   Defendants had a post-sale duty to warn Plaintiffs and or Plaintiffs' physicians about the potential risks and complications associated with Diet Drugs in a timely manner.

153.   The misrepresentations by Defendants constitute a continuing tort.

154.  Defendants made the statements and/or omissions with the intention that Plaintiffs, Plaintiffs' prescribing physicians or other dispensing entities and the consuming public would rely on such or the absence of such information in selecting Diet Drugs as a treatment for weight loss.

155.  As a direct and legal result of the fraudulent and/or negligent misrepresentations of Defendants, Plaintiffs have sustained serious and permanent injuries including, but not limited to, injuries to the heart, pulmonary system and/or other physical injuries, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of the ability to earn money in the future. Plaintiffs' injuries and losses are continuing in nature.

WHEREFORE, Plaintiffs demand judgment against Defendants for damages, as well as all costs of this action.

### COUNT V
### FRAUDULENT CONCEALMENT
### (AGAINST DEFENDANT INTERNEURON ONLY)

156.  Plaintiffs adopt by reference all of the allegations above, each inclusive, as though fully set forth herein.

157.  To date, even in light of the existence of overwhelming scientific proof in the form of countless epidemiologic studies and other tests and/or studies, Defendant, Interneruon, still claims that "[b]ased on the results of studies to date, the incidence of cardiac valve abnormalities has been shown to be less than that suggested by the original FDA preliminary analysis. In general, these studies have shown either no or relatively small differences, although in some cases statistically significant, between the incidence of cardiac valve abnormalities, as defined by the FDA, among

patients who took Redux and placebo-treated patients and that the incidence of such abnormalities among Redux patients was less than previously reported estimate."

158. Furthermore, in response to law suits which have been brought against Interneuron by shareholders claiming that Interneuron misled shareholders and committed securities fraud relating to its actions associated with the approval and subsequent marketing of Redux, Interneuron has plainly yet fallaciously stated that it did not conceal known risks regarding Redux, and it has uniformly denied the causal link between Redux ingestion and the injuries referenced herein.

159. Interneuron, having undertaken the manufacturing, marketing, prescription dispensing, distributing and promotion of Redux owed a duty to provide complete and accurate information regarding the drug to Plaintiffs, their physicians, and anyone else it knew or should have known would ingest or prescribe Redux.

160. Interneuron has misrepresented material facts regarding the safety and efficacy the diet drug, and failed to inform Plaintiffs, the public and Plaintiffs' prescribing physicians these material facts, to this day.

161. The continuous and ongoing course of action constituting fraudulent concealment on Plaintiffs started as early as 1992, if not earlier, and continued through repeated acts and non-disclosure every year since then throughout the United States and elsewhere.

162. Interneuron actively concealed adverse information at a time when it knew, or should have known, that Redux had defects, dangers, and characteristics that were other than what it knew or should have known existed regarding the dangerous side effects associated with Redux.

163. The active concealment alleged were perpetuated directly and indirectly by Interneuron, and took the form of, among other things, express and implied statements, publicly disseminated misinformation, misinformation provided to regulatory agencies, inadequate, incomplete and

misleading warnings about the subject products, and a campaign of misinformation intended to convince Plaintiffs, Plaintiffs prescribing physicians, and the public that Redux is not associated with VHD or PH, and is in fact a safe and effective product.

164.  Interneuron knew or should have known that these representations were false or misleading at the time they were made or omitted or concealed, and made the representations with the intent or purpose that Plaintiffs and Plaintiffs' physicians would rely on them, leading to the use of Redux by Plaintiffs, and with the specific intention that Plaintiffs rely on such misrepresentations and concealment by delaying in obtaining appropriate medical care and monitoring, in discovering their injuries associated with the use of Redux, and in discovering that such injuries were caused by the acts and omissions of Interneuron.

165.  Plaintiffs and Plaintiffs' physicians had no knowledge of the information concealed and suppressed by Defendants and were unaware of the inaccuracy of any statements being made and believed them to be true.

166.  Plaintiffs and Plaintiffs' physicians justifiably relied on and were induced by Interneuron's active concealment and relied on such actions, statements, and omissions.

167.  Interneuron had a post-sale duty to warn Plaintiffs and or Plaintiffs' physicians about the potential risks and complications associated with Redux in a timely manner.

168.  The misrepresentations and active concealment by Interneuron constitutes a continuing tort.

169.  Such concealment has served to toll any applicable statute of limitations that applies to Plaintiffs' claims against Interneuron.   As a direct result of the concealment, and their justified reliance thereon, Plaintiffs did not and could not have discovered their injuries caused by the ingestion of Redux, until they received an echocardiogram which indicated the presence of FDA

positive valvular heart disease and did not and could not have discovered that such injury was caused by the acts and omissions of Interneuron or their ingestion of Redux..

170.   As a direct and legal result of the fraudulent concealment by Interneuron, Plaintiffs have sustained serious and permanent injuries including, but not limited to, injuries to the heart, pulmonary system and/or other physical injuries, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of the ability to earn money in the future. Plaintiffs' injuries and losses are continuing in nature.

WHEREFORE, Plaintiffs demand judgment against Defendants Interneuron for damages, as well as all costs of this action.

### COUNT VI
### G.L. c. 93A UNFAIR AND DECEPTIVE PRACTICES
### (AGAINST DEFENDANTS INTERNEURON AND BOEHRINGER ONLY)

171.   Plaintiffs adopt by reference all of the allegations above, each inclusive, as though fully set forth herein.

172.   Defendants Interneuron and Boehringer were at all times material hereto engaged in the conduct of trade and commerce throughout the United States including the Commonwealth of Massachusetts and the States within which Plaintiffs were prescribed and ingested Redux.

173.   Defendants Interneuron and Boehringer engaged in trade and commerce with respect to the design, manufacture, approval, marketing,  promotion, distribution and sale of Redux, a defective product, which was unfit for its intended use, and which had risks that substantially outweighed any benefits.

52

174. Defendants Interneuron and Boehringer, in furtherance of their business of trade and commerce, did knowingly and willfully fail to disclose to Plaintiffs individually and by and through their physicians information about the risks associated with the ingestion of Redux.

175. Interneuron and Boehringer made misleading statements and failed to disclose information to Plaintiffs individually and by and through their physicians concerning Redux in its marketing, promotion, distribution, and sale.

176. Interneuron and Boehringer knew the facts concerning Redux were material to Plaintiffs and their physicians in assessing the safety of Redux. Defendants also knew that withholding this information would place Plaintiffs at further risk of injury.

177. Interneuron and Boehringer made these misrepresentations and failed to disclose material facts for the purpose of inducing Plaintiffs to purchase and ingest Redux.

178. Plaintiffs relied to their detriment on Interneuron's and Boehringer's representations that Redux was an effective and relatively risk free diet drug.

179. As a result of their reliance and as a direct and proximate cause of Interneuron's and Boehringer's willful or knowing unfair or deceptive acts or practices in violation of G.L. c. 93A, § 2, Plaintiffs have sustained serious and permanent injuries including, but not limited to, injuries to the heart, pulmonary system and/or other physical injuries, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expense of hospitalization, medical and nursing care and treatment, loss of earnings, and loss of the ability to earn money in the future. Plaintiffs' injuries and losses are continuing in nature.

180. Interneuron's and Boehringer's violation of G.L. c. 93A, § 2 entitles Plaintiffs individually to an award of actual damages and reasonable attorney's fees and costs incurred in connection with said action.

181.  Interneuron's and Boehringer's actions which resulted in their failure to provide accurate and sufficient information about the true risks of pulmonary hypertension, VHD and other injuries constitute unfair and deceptive acts and practices as defined in G.L. c. 93A.

182.  Defendants knowingly and willfully engaged in these unfair and deceptive acts and practices in violation of G.L. c. 93A, § 2, entitling Plaintiffs to an award of up to treble but not less than double damages against Defendants Interneuron and Boehringer.

183.  Defendants' unfair and deceptive acts and practices occurred primarily and substantially within Massachusetts because, among other things: Defendants' principal place of business is in Lexington, Massachusetts and at all relevant times Defendants and its officials were conducting business in Massachusetts when they engaged in unfair and deceptive acts and practices; and Defendants committed said unfair and deceptive acts in marketing, promoting, packaging, labeling, compounding, distributing, detailing, and/or selling Redux to the public, including Plaintiffs.

184.  Plaintiffs have substantially complied and/or will comply with all requirements of G.L. c. 93A , § 9.

WHEREFORE, Plaintiffs demand judgment against Defendants Interneuron and Boehringer for damages, including actual damages, which Plaintiffs request to be trebled or doubled by the

Court, as well as reasonable attorney's fees and costs incurred in connection with this action, and any

other relief this Court deems proper.

PLAINTIFFS CLAIM A TRIAL BY JURY.

Edward J. Barshak, (BBO No. 032040)
Michael S. Appel, (BBO No. 543898)
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street, 9th Floor
Boston, MA 02114
(617) 227-3030

John R. Oldham, Esquire
Faddis, Oldham & Smith, P.A.
2709 W. Fairbank Avenue, Suite 200
Winter Park, FL 32789

DATED: March 12, 2004

# COMMONWEALTH OF MASSACHUSETTS

EASTERN COUNTIES, SS.                                SUPERIOR COURT
MIDDLESEX, SS.

04-1186 H

---

**IN RE MASSACHUSETTS STATE COURT
DIET DRUG LITIGATION**

**Civil Action
No. 00-9999-G**

Jane Antuono; Leisa Boutwell;
Beverly Brown; Margaret Colosimo;
Patricia Crawford; Donna Dyer;
Dorothy Ellis; Shirley Garrett;
Susan Ginsberg; Alyce Greer,

      Plaintiffs

v.

Indevus Pharmaceuticals, Inc., F/K/A
Interneuron Pharmaceuticals, Inc.;
Wyeth, Inc., F/K/A American Home
Products Corporation;
Wyeth Pharmaceuticals, Inc F/K/A
Wyeth-Ayerst Pharmaceuticals,
Inc., A Division Of American Home Products
Corporation; and Boehringer Ingelheim
Pharmaceuticals, Inc.,

      Defendants



FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FOR THE COU...

MAR 29 2004

CLERK

Motion Allowed

Attest: _____ Ellen M. DiRoce
Deputy Assistant Clerk
(Brassard, J.)

---

## MOTION FOR APPOINTMENT
## OF SPECIAL PROCESS SERVER

Now come the plaintiffs in the above-captioned matter and move that this Court appoint

Constables Philip D. Fixman, Michael B. Fixman and Daniel P. Kochakian of Michael B.

Fixman & Associates (disinterested parties and over the age of eighteen), 72 Hancock Street,

P.O. Box 83, Everett, Massachusetts or a representative thereof, as Special Process Server, for

the purpose of serving any and all process served in this case, including but not limited to the

Complaint.

_Edward J. Barshak_

Edward J. Barshak, (BBO No. 032040)
Michael S. Appel, (BBO No. 543898)
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street, 9th Floor
Boston, MA 02114
(617) 227-3030

John R. Oldham, Esquire
Faddis, Oldham & Smith, P.A.
2709 W. Fairbank Avenue, Suite 200
Winter Park, FL 32789

DATED: March 12, 2004

2

COMMONWEALTH OF MASSACHUSETTS

EASTERN COUNTIES, SS.                              SUPERIOR COURT
MIDDLESEX, SS.

| | |
|---|---|
| IN RE MASSACHUSETTS STATE COURT DIET DRUG LITIGATION | Civil Action No. 00-9999-G |

**IN RE MASSACHUSETTS STATE COURT
DIET DRUG LITIGATION**

**Jane Antuono; Leisa Boutwell;
Beverly Brown; Margaret Colosimo;
Patricia Crawford; Donna Dyer;
Dorothy Ellis; Shirley Garrett;
Susan Ginsberg; Alyce Greer,**

       Plaintiffs

v.

**Indevus Pharmaceuticals, Inc., F/K/A
Interneuron Pharmaceuticals, Inc.;
Wyeth, Inc., F/K/A American Home
Products Corporation;
Wyeth Pharmaceuticals, Inc F/K/A
Wyeth-Ayerst Pharmaceuticals,
Inc., A Division Of American Home Products
Corporation; and Boehringer Ingelheim
Pharmaceuticals, Inc.,**

       Defendants

**Civil Action
No. 00-9999-G**

**C.A. NO. 04-1186**

**FIRST AMENDED
COMPLAINT**

F I L E D
IN THE OFFICE OF THE
CLERK OF THE COURTS

AP   2004

           CLERK

     Plaintiffs hereby adopt and incorporate the entire original complaint, amended only as

follows:

1.      The title of Count I is amended to:

BREACH OF WARRANTY
DEFECTIVE DESIGN

2.      The title of Count II is amended to:

**BREACH OF WARRANTY**
**FAILURE TO WARN**

3.      The following paragraph 185 is added:

185.      Plaintiffs have pursuant to Massachusetts G.L. c. 93A sent to Interneuron

and Boehringer a letter of demand for settlement.

_____
Edward J. Barshak (BBO No. 032040)
Michael S. Appel (BBO No. 543898)
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street, 9th Floor
Boston, MA 02114
(617) 227-3030

John R. Oldham, Esquire
Faddis, Oldham & Smith, P.A.
2709 W. Fairbank Avenue, Suite 200
Winter Park, FL 32789

DATED: April ____, 2004